[Cite as *State v. Gear*, 2023-Ohio-1246.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## VAN WERT COUNTY


STATE OF OHIO,

        **CASE NO. 15-22-03**

    PLAINTIFF-APPELLEE,

    v.

DALE H. GEAR,                  **O P I N I O N**

    DEFENDANT-APPELLANT.


**Appeal from Van Wert County Common Pleas Court**
**Trial Court No. CR-21-08-086**

**Judgment Affirmed**

**Date of Decision: April 17, 2023**


**APPEARANCES:**

    *Zachary D. Maisch* **for Appellant**

    *Kelly J. Rauch* **for Appellee**

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Dale H. Gear ("Gear") appeals the judgment of the Van Wert County Court of Common Pleas, alleging that his conviction is not supported by sufficient evidence; that the verdict was against the manifest weight of the evidence; that the trial court erred by failing to grant him a new trial; and that he was denied his right to the effective assistance of counsel. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} On July 21, 2016, Jeffrey A. Glossett ("Jeffrey") reported that his son, Kori Glossett ("Kori"), was missing. Tr. 119. Jeffrey stated that the last time he had communicated with Kori was on June 16, 2016. Tr. 121. Officer Joshua Staten ("Officer Staten") of the Van Wert Police Department learned from officials in Allen County, Ohio that Kori had been taken into custody on June 16, 2016 and had been released from their custody on June 24, 2016. Tr. 123-124, 143, 187. The police also discovered that Kori was then released on bond from the Van Wert Municipal Court on June 24, 2016. Tr. 187. Ex. 1. Kori did not appear at a court hearing that was scheduled for June 26, 2016. Tr. 162.

{¶3} Records from the Van Wert Municipal Court indicated that Gear had posted Kori's bond on June 24, 2016. Tr. 143, 180, 187. Ex. 1. A subsequent investigation could not trace Kori's whereabouts past his time with Gear on June 25, 2016. Tr. 144-145. Around July 21 or 22, 2016, law enforcement left a note on

Gear's door, requesting him to contact the police. Tr. 132, 172. In response, Lieutenant Jeffrey Hammons ("Lt. Hammons") of the Van Wert Police Department received a call from Gear on July 22, 2016. Tr. 132. Ex. 16. Gear reported that he had not heard from Kori since dropping him off at a location in Van Wert on June 25, 2016. Tr. 132. Ex. 16.

{¶4} On August 9, 2016, Gear came into the Van Wert City Police Department for an interview with Detective Cory Reindel ("Detective Reindel"). Tr. 142. At this interview, Gear stated that he had woken up at roughly 10:00 A.M. on the morning of June 25, 2016. Tr. 166. He reported that Kori had then asked for a ride to a location in Van Wert. Tr. 166. Gear stated that, after driving together to this location, Kori exited the vehicle on North Franklin Street. Tr. 166. Gear also indicated that he was aware that Kori had not appeared for the scheduled court hearing on June 26, 2016. Tr. 160-162.

{¶5} The police obtained information that Gear had used an Automated Teller Machine ("ATM") at First Financial Bank on June 24, 2016 at 2:06 P.M. and then on June 25, 2016 at 7:08 A.M. Tr. 214. The police examined the video footage that was recorded during both of these transactions. In the video footage from the afternoon of June 24, Kori was in the passenger seat of the vehicle driven by Gear. Tr. 186, 208, 217. Ex. 20-4. In the footage from the following morning, Gear was alone in his vehicle. Tr. 217. Ex. 20-3. The police also discovered from various

purchase records that Gear had bought one gallon of concentrated blacktop and concrete cleaner from Ace Hardware Store on July 31, 2016. Tr. 183.

{¶6} On October 5, 2016, law enforcement executed a search warrant for a property owned by Gear. Tr. 170. The police entered Gear's garage and applied a chemical agent that would react to the presence of even trace amounts of blood by producing a bluish luminescent tint. Tr. 171, 248. The chemical agent indicated that blood had been present on the garage floor. Tr. 171. The chemical agent revealed swirling and linear patterns in the blood on the garage floor that were consistent with the markings that would be left by the use of a mop or a broom. Tr. 171, 258, 276.

{¶7} The police located a mop in Gear's basement. Tr. 274-275. Testing revealed the presence of blood on the head of the mop. Tr. 275. The police also took several vehicles from in or around Gear's garage to a secure facility for further examination. Tr. 245, 247. One of these vehicles was a red pickup truck. Tr. 264. The police discovered patches of blood along the driver's side of this red pickup truck. Tr. 264, 269. Ex. 3. Samples were collected from these areas of the vehicle. Tr. 271, 328-329. David Hammond ("Hammond"), who works for the Ohio Bureau of Criminal Investigation ("BCI"), was involved in the search of the premises. Tr. 242. After examining the spots on the side of the red pickup truck, Hammond concluded that the flow pattern of the blood on the vehicle appeared to have been created by gravity rather than by scrubbing or cleaning. Tr. 295.

{¶8} Law enforcement sent a selection of samples that were collected during this search to BCI for analysis, but subsequent testing on this initial batch of samples did not establish a connection to Kori. Tr. 333. Hallie Dreyer ("Dreyer"), who works for BCI as a forensic scientist and laboratory supervisor, stated that "there was nothing foreign * * * detected" in this initial batch of samples. Tr. 333. However, not all samples from the search of Gear's property were submitted to BCI in 2016. Tr. 333.

{¶9} In 2020, Detective Kyle Fittro of the Van Wert County Sheriff's Office reviewed this case and consulted with several individuals at BCI to determine what might be done to further the investigation into Kori's disappearance. Tr. 223. As a result, the Van Wert County Sheriff's Office then submitted several untested blood samples that had been collected from Gear's property in 2016 to BCI in August of 2020. Tr. 225. BCI had obtained DNA samples from Kori's parents, Jeffrey and Denise Brown ("Denise"), to use as a standard in this analysis. Tr. 324. Subsequent testing established that the blood samples that had been taken from the side of Gear's red pickup truck contained the DNA of a child of Jeffrey and Denise. Tr. 330.

{¶10} On August 5, 2021, Gear was indicted on one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree. Doc. 2. A jury trial on this charge began on June 6, 2022. Tr. 1. By the time of the trial, Kori had still not been located. Tr. 199, 227. On June 8, 2022, the jury found Gear guilty of the charge against him. Doc. 70. On July 26, 2022, Gear filed a motion

for a new trial. Doc. 73. On July 27, 2022, the trial court denied the motion for a new trial on the grounds that it was not timely filed. Doc. 78. On July 27, 2022, the trial court also issued its judgment entry of sentencing. Doc. 79.

{¶11} Gear filed his notice of appeal on August 21, 2022. Doc. 98. On appeal, he raises the following four assignments of error:

**First Assignment of Error**

**The trial court erred to the prejudice of appellant as there was insufficient evidence to convict.**

**Second Assignment of Error**

**The trial court erred to the prejudice of appellant as the verdict was against the manifest weight of the evidence.**

**Third Assignment of Error**

**The trial court erred by failing to grant appellant a new trial.**

**Fourth Assignment of Error**

**Appellant was denied his Sixth Amendment right to the effective assistance of counsel due to his trial counsel's cumulative errors and failure to call an expert witness.**

*First Assignment of Error*

{¶12} Gear argues that his conviction for tampering with evidence is not supported by sufficient evidence.

Legal Standard

{¶13} "A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the state has met its burden of

production at trial." *In re Swift*, 8th Dist. Cuyahoga No. 79610, 2002-Ohio-1276, ¶ 19, citing *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541 (1997). This analysis "addresses the question of whether adequate evidence was produced for the case to be considered by the trier of fact and, thus, whether the evidence was 'legally sufficient to support the verdict * * *.'" *State v. Barga*, 3d Dist. Shelby No. 17-17-14, 2018-Ohio-2804, ¶ 8, quoting *State v. Worthington*, 3d Dist. Hardin No. 6-15-04, 2016-Ohio-530, ¶ 12.

**{¶14}** "An appellate court is not to examine whether the evidence presented should be believed but should rather 'examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Wilson*, 2022-Ohio-504, 185 N.E.3d 176, ¶ 57 (3d Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259, 274, 574 N.E.2d 492 (1991), *superseded by state constitutional amendment on other grounds, State v. Smith*, 80 Ohio St.3d 89, 1997-Ohio-355, 684 N.E.2d 668 (1997). On appeal, the applicable standard of review

> **is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.**

*State v. Brown*, 3d Dist. Hancock No. 5-17-19, 2018-Ohio-899, ¶ 27, quoting *State v. Plott*, 2017-Ohio-38, 80 N.E.3d 1108, ¶ 62 (3d Dist.).

**{¶15}** To establish a conviction for tampering with evidence in violation of R.C. 2921.12(A)(1), the State must prove that the defendant, "[1] knowing that an official proceeding or investigation [was] * * * in progress, or is about to be or likely to be instituted, * * * [2] [a]lter[ed], destroy[ed], conceal[ed], or remove[d] any record, document, or thing, [3] with purpose to impair its value or availability as evidence in such proceeding or investigation." R.C. 2921.12(A)(1). *See State v. Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, 11 N.E.3d 1175, ¶ 11 (holding that there are three elements for this offense).

Legal Analysis

**{¶16}** In this case, the police discovered that Gear had posted bond for Kori on June 24, 2016. Tr. 142-143, 180, 187. Ex. 1. The police uncovered footage from an ATM at First Financial Bank in which Kori could be seen in the passenger seat of the vehicle driven by Gear. Tr. 208, 214, 217. This footage had a timestamp of 2:06 P.M. on June 24, 2016. Tr. 214. Gear later told the police that he woke up on June 25, 2016 at roughly 10:00 A.M. and that Kori was at his (Gear's) house. Tr. 166. Gear stated that Kori had asked for a ride to a location in Van Wert; that he drove Kori to this location; and that he had not seen Kori since that time. Tr. 166. *See also* Tr. 131-132. Ex. 16.

**{¶17}** However, the police discovered ATM footage of Gear alone in his car at 7:08 A.M. on June 25, 2016 at First Financial Bank, leading the police to question the accuracy of Gear's account of his activities on that date. Tr. 167, 214. Gear

also informed the police that he had posted bond for Kori and that he was aware that Kori had not appeared for a court hearing that had been scheduled for June 26, 2016. Tr. 160-161, 187. On July 21, 2016, Jeffrey reported Kori missing. Tr. 119. On receiving this missing persons report, the police began an investigation into Kori's whereabouts. Tr. 119, 124, 131.

{¶18} On July 21 or 22, 2016, law enforcement left a note on Gear's door, asking for him to contact the police. Tr. 132, 172. In response, Gear contacted the police and informed Lt. Hammons that he had not seen Kori since June 25, 2016 when he dropped Kori off at a location in Van Wert. Tr. 131-132. Ex. 16. Thus, as of July 22, 2016, Gear was aware that the police were conducting a missing persons investigation and were actively seeking information about Kori's whereabouts.

{¶19} Records from Ace Hardware indicate that Gear purchased a gallon of blacktop and concrete cleaner on July 31, 2016. Tr. 115, 183. Ex. 19. At trial, the owner of this Ace Hardware location testified that Gear had purchased a concentrated form of this cleaner that "would mix a lot * * *." Tr. 106, 116. He explained that this cleaner could be used "to clean the surface of either black top or concrete * * * as a remover of some sort." Tr. 116. The police investigation was not able to trace Kori's whereabouts past his time with Gear or uncover any other person who had contact with Kori after Gear. Tr. 144-145.

**{¶20}** On October 5, 2016, law enforcement conducted a search of a garage on Gear's property. Tr. 170. During this process, law enforcement used a chemical agent that produces a bluish luminescence when put into contact with even the slightest traces of blood that are located on a given surface. Tr. 248. Hammond testified that, when this chemical agent was applied to the floor of Gear's garage, he observed a "very strong" reaction across this surface, extending to the northwest corner of his garage. Tr. 198, 248, 252. He then testified that Tetramethylbenzadine was subsequently applied to these areas and "was positive for blood * * *." Tr. 256.

**{¶21}** The chemical agent also revealed a pattern in the blood that was detected on the floor. Tr. 258-261. Hammond described this pattern as follows:

> **[W]e noticed a little bit of like brushing or some linear, some linear marks on the floor and what that kind of told us was that like maybe a mop, the fabric of a mop or a broom had been moved through that area.**

Tr. 258. He further described this pattern as containing "swirl marks." Tr. 258. During their search, law enforcement discovered a mop in the basement of Gear's home. Tr. 258. They sprayed the chemical agent on the mop, and "it was presumptive positive for potential blood being in the mop * * *." Tr. 275.

**{¶22}** Hammond stated that concrete and blacktop cleaner "would potentially degrade blood, mak[ing] it harder to find." Tr. 284. Dreyer testified that "[t]here wasn't enough DNA that was detected" on the mop head "to actually test DNA profiles on this item," though "[t]here was some visible staining on it." Tr.

326. Similarly, Dreyer stated that the samples from "the garage center" did not "have good enough quality DNA" to "detect a profile * * *." Tr. 332.

{¶23} However, Hammond had testified that law enforcement had taken samples from patches of blood that were discovered on the driver's side of Gear's red pickup truck. Tr. 263-268. Ex. 3. Dreyer testified that BCI obtained DNA samples from Kori's parents, Jeffrey and Denise, to use as a DNA standard to test the blood samples taken from areas along the red pickup truck. Tr. 324. Dreyer testified that the DNA from these samples was from a child of Jeffrey and Denise. Tr. 337.

{¶24} Given this evidence, Gear raises two main arguments to establish that his conviction is not supported by sufficient evidence. First, he points to the fact that the blood that was located on his garage floor was too degraded to be tested. Gear argues that, in the absence of proof that the blood on the garage floor came from Kori, the State cannot establish that any abstersion of the garage floor constituted the crime of tampering with evidence that was related to the police investigation into Kori's disappearance.

{¶25} However, in his brief, Gear does admit that the "blood of Glossett [was] found * * * located on the red Ford truck." Appellant's Brief, 3. Given this fact, if the State was able to draw a connection between the blood that was located on Gear's red pickup truck and the blood that was located on the floor of Gear's

garage, it could establish that Gear had committed the crime of tampering with evidence by cleaning up the areas of his garage floor where blood was detected.

**{¶26}** At trial, Hammond affirmed that this red pickup truck appeared to be "a rusty old fixer-up truck" and was "probably" a [r]estoration project * * *[.]" Tr. 297. Several pictures of this red pickup truck were introduced at trial. Ex. 3. Hammond, who had taken these pictures, testified at trial as follows:

> **I can't remember if the vehicles were already gone when I got there at the scene or if they were removed while we were working inside the home. I just don't remember.**

Tr. 262. He also affirmed that, by the time that he had entered the garage, "the vehicles in that garage were out of the garage." Tr. 247. Hammond further explained the following:

> **When I went into the garage that day, I believe that the deputies from the Van Wert County Sheriff's Office and the Van Wert Police Department had removed several vehicles and towed them to a secure facility for them to be examined at a later day. So, when I walked into the garage it was fairly empty.**

Tr. 246. Thus, Hammond testified that the vehicles that were removed from the garage were taken to a secure facility for inspection. Tr. 246. He then stated that the red pickup truck was one of the removed vehicles that he examined in the secure facility. Tr. 263. Ex. 3. Further, even if Gear's red pickup truck had been outside of the garage, the chemical agent applied to the garage floor to detect the presence of blood had a "really strong reaction" in the area in front of the pedestrian door on the garage. Tr. 291. Ex. 5-5, 5-6.

{¶27} This testimony is sufficient to establish a connection between the blood discovered on Gear's vehicle and the blood discovered on his garage floor. Given the proximity of the blood on Gear's red pickup truck and the blood located on Gear's garage floor, a reasonable juror could infer from these facts that the blood on Gear's red pickup truck and the blood on the garage floor came from the same source.

{¶28} Second, Gear asserts that the police did not establish precisely when the blood discovered on his red pickup truck or on his garage floor was deposited in those locations. However, in this case, the prosecution produced a significant amount of testimony to establish the timeline for Kori's disappearance; the subsequent investigation into his whereabouts; and Gear's activities after he had posted bond for Kori.

{¶29} The State produced evidence that Gear had posted bond for Kori on June 24, 2016; that Gear indicated that he was with Kori on June 25, 2016; that Gear gave information to the police about his activities on June 25, 2016 that appears to have been inaccurate; and that Kori did not appear for a court hearing on June 26, 2016. Tr. 143, 161-162, 166-167. Gear also told the police that Kori had gone to Tennessee. Ex. 16. However, the police conducted a thorough investigation into this lead and uncovered no evidence to substantiate this claim. Tr. 145-146.

{¶30} The State produced evidence that established that Kori was reported missing on July 21, 2016; that Gear was made aware that the police were conducting

an investigation into Kori's whereabouts on July 21 or 22, 2016; and that Gear purchased a large amount of concrete cleaner on July 31, 2016. Tr. 115, 119, 132, 172, 191-192. Ex. 19. The police found no evidence of any other person having contact with Kori or knowledge of his whereabouts after his time with Gear on June 25, 2016. Tr. 144-146. Thus, Gear appears to have been the last known person to have had contact with Kori. Tr. 144. By the time of trial, Kori still had not been located. Tr. 139, 222.

**{¶31}** The State then produced evidence that law enforcement executed a search warrant for Gear's property on October 5, 2016; that this search uncovered blood on Gear's garage floor that had been apparently degraded by abstersion; that law enforcement located a mop with blood on its head; and that DNA matching a child of Kori's parents was located on Gear's red pickup truck on Gear's property. Tr. 171, 242, 251, 255, 258, 275, 276, 328-329, 330.

**{¶32}** This timeline establishes that the police discovered blood that matched a child of Kori's parents on Gear's property just over three months after Kori disappeared. This timeline also establishes that the police discovered blood on Gear's garage floor that had been apparently degraded by abstersion just over two months after he had purchased a significant amount of concrete cleaner from Ace Hardware. From this evidence, a reasonable juror could conclude that, after Gear had learned about the investigation into Kori's whereabouts, Gear had cleaned the

blood on his garage floor because the blood on the garage floor was evidence that was related to the investigation into Kori's disappearance.

{¶33} Having viewed this evidence in a light most favorable to the prosecution, we concluded that a reasonable trier of fact could find that the State presented some evidence to substantiate each of the essential elements of the crime of tampering with evidence. Thus, Gear has not, with these arguments, demonstrated that his conviction is not supported by sufficient evidence. For this reason, his first assignment of error is overruled.

*Second Assignment of Error*

{¶34} Gear argues that his conviction for tampering with evidence was against the manifest weight of the evidence.

Legal Standard

{¶35} "In a manifest weight analysis, 'an appellate court determines whether the state has appropriately carried its burden of persuasion.'" *State v. Richey*, 2021-Ohio-1461, 170 N.E.3d 933, ¶ 29 (3d Dist.), quoting *State v. Blanton*, 121 Ohio App.3d 162, 169, 699 N.E.2d 136 (3d Dist. 1997). "Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict." *Plott, supra*, at ¶ 73. Thus, "the appellate court sits as a 'thirteenth juror' * * *." *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 17, quoting *Thompkins, supra*, at 387. On appeal, courts

**must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'**

*State v. Schatzinger*, 3d Dist. Wyandot No. 16-20-04, 2021-Ohio-167, ¶ 52, quoting *State v. Brentlinger*, 2017-Ohio-2588, 90 N.E.3d 200, ¶ 36 (3d Dist.), quoting *Thompkins, supra,* at 387.

{¶36} "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Sullivan,* 2017-Ohio-8937, 102 N.E.3d 86, ¶ 38 (3d Dist.), quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

Legal Analysis

{¶37} On cross-examination, defense counsel questioned Hammond extensively about the physical evidence that was collected during the search of Gear's property. Hammond testified that he could not determine precisely when the blood was deposited onto the concrete floor or when the linear or swirl-shaped streaks pattern was created in the blood residue. Tr. 290, 293. He stated that the

chemical agent that was used to locate the blood on Gear's property has been effective at exposing blood deposits that were made over one hundred and fifty years prior to its application. Tr. 250, 290. He further stated that the garage appeared to be fairly old, though the concrete floor appeared to be newer than the structure. Tr. 292.

{¶38} When questioned about the blood that was located on the front side of the red pickup truck, Hammond stated that he could not conclude that this blood had been tampered with because the flow pattern of this blood deposit appeared to have been the result of gravity rather than alteration by cleaning. Tr. 295. He stated that there was a possibility that the blood deposits on the bedrail of the red pickup truck could possibly have been altered by cleaning but that this area did not have swirl patterns like the floor. Tr. 302-303. The testimony from Dreyer indicated that the blood deposits on the side of the red pickup truck produced the only usable blood samples that were tested and found to be from a child of Kori's parents. Tr. 330, 337.

{¶39} Hammond also testified that traces of blood were located in other parts of Gear's property and that some of this blood was tested and found to be animal blood. Tr. 300. However, on direct examination, Hammond had already testified that this animal blood had been located in Gear's basement. Tr. 280. Hammond explained that Gear's dog had a condition that prevented blood clots from forming.

Tr. 280. Samples of these blood spots from the basement were taken, tested, and found to contain animal blood. Tr. 280.

**{¶40}** Further, Dreyer testified that no DNA standard was available from Kori for testing. Tr. 330. However, she explained that a DNA standard was obtained from Kori's parents, Jeffrey and Denise. Tr. 324. She stated that the testing revealed that the blood on the red pickup truck came from a biological child of Jeffrey and Denise. Tr. 337. Dreyer also testified that the samples taken from the garage floor and the mop were not usable for DNA testing. Tr. 326, 332.

**{¶41}** Having examined the evidence in the record on the basis of its weight and credibility, we cannot conclude that Gear's conviction for tampering with evidence is against the manifest weight of the evidence. In this case, the blood located on the side of the red pickup truck did not manifest any apparent signs of having been tampered with, was not degraded, and was usable in subsequent DNA testing. The red color of the pickup truck makes detection of the blood spots on the side of the vehicle difficult in the absence of a thorough inspection. Ex. 3. By contrast, the blood located on the garage floor contained swirl-shaped or linear patterns, was degraded, and was not usable in subsequent DNA testing. The testimony at trial also indicated that the police had located blood on a mop in Gear's possession and had discovered that Gear had purchased a large amount of concrete cleaner after learning that the police were investigating Kori's disappearance.

{¶42} Based on these facts, the jury could reasonably infer that the blood on the floor of the garage was degraded and rendered unusable for DNA testing because Gear had committed the crime of tampering with evidence. There is no indication in the record that the jury lost its way and returned a verdict that was against the manifest weight of the evidence. Since Gear has not demonstrated that the evidence presented at trial weighs heavily against his conviction for tampering with evidence, his second assignment of error is overruled.

### Third Assignment of Error

{¶43} Gear argues that the trial court erred in denying his motion for a new trial.

### Legal Standard

{¶44} "Motions for a new trial are governed by Crim.R. 33."[1] *State v. Cunningham*, 2016-Ohio-3106, 65 N.E.3d 307, ¶ 28 (3d Dist.). Crim.R. 33(A) provides the following grounds for a new trial:

> **(1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;**
>
> **(2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state;**

---

[1] In this case, Gear filed a motion for a new trial that cites to R.C. 2945.79. Doc. 73. However, this provision has been superseded by Crim.R. 33. *State v. Reed*, 65 Ohio St.2d 117, 418 N.E.2d 1359 (1981), fn. 1; *State v. Ray*, 3d Dist. Union No. 14-05-39, 2006-Ohio-5640, ¶ 58. For that reason, we will apply Crim.R. 33 to Gear's arguments in this appeal. *State v. Guy*, 10th Dist. Franklin No. 17AP-322, 2018-Ohio-4836, fn. 1; *State v. Roby*, 11th Dist. Ashtabula No. 2020-A-0024, 2020-Ohio-6812, ¶ 11. We also note that much of the wording in R.C. 2945.79 and Crim.R. 33 is identical. *See State v. Miller*, 105 Ohio App.3d 679, 664 N.E.2d 1309, fn. 3 (4th Dist. 1995).

**(3) Accident or surprise which ordinary prudence could not have guarded against;**

**(4) That the verdict is contrary to law;**

**(5) Error of law occurring at the trial;**

**(6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. \* \* \***

Crim.R. 33(A). Further, Crim.R. 33(B) reads in a relevant part as follows:

**(B) Motion for New Trial; Form, Time. Application for a new trial shall be made by motion which, except for the cause of newly discovered evidence, shall be filed within fourteen days after the verdict was rendered, or the decision of the court where a trial by jury has been waived, unless it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from filing his motion for a new trial, in which case the motion shall be filed within seven days from the order of the court finding that the defendant was unavoidably prevented from filing such motion within the time provided herein.**

Crim.R. 33(B). "A motion for a new trial, filed pursuant to Crim.R. 33, is not to be granted lightly." *State v. King*, 3d Dist. Seneca No. 13-01-20, 2002-Ohio-1423, 2002 WL 479159, \*2 (Mar. 29, 2002). "The discretionary decision to grant a new trial is an extraordinary measure, and should be used only when the evidence presented weighs heavily in favor of the moving party." *Id.*

**{¶45}** "A reviewing court will not disturb a trial court's decision granting or denying a Crim.R. 33 motion for new trial absent an abuse of discretion." *State v. Doogs*, 3d Dist. Wyandot No. 6-19-08, 2020-Ohio-3769, ¶ 23, quoting *State v.*

-20-

*Sanders*, 188 Ohio App.3d 452, 2010-Ohio-3433, 935 N.E.2d 905, ¶ 18 (10th Dist.). "An abuse of discretion is not merely an error of judgment." *Sullivan*, *supra*, at ¶ 20. "Rather, an abuse of discretion is present where the trial court's decision was arbitrary, unreasonable, or capricious." *State v. Kleman*, 3d Dist. Hardin No. 6-19-01, 2019-Ohio-4404, ¶ 18, quoting *State v. Howton*, 3d Dist. Allen No. 1-16-35, 2017-Ohio-4349, ¶ 23.

### Legal Analysis

**{¶46}** In this case, the trial court denied Gear's motion for a new trial on the grounds that it was not timely filed under Crim.R. 33. Doc. 78. A review of the record indicates that the jurors returned a verdict on June 8, 2022. Doc. 70. Gear filed his motion for a new trial on July 26, 2022. Doc. 78. Thus, this filing occurred outside of the fourteen-day timeframe permitted by Crim.R. 33. Further, this motion was based on the content of a conversation that defense counsel had with a juror just after the trial had concluded. Accordingly, there is no indication that Gear was unavoidably prevented from filing a motion for a new trial within fourteen days of the jury verdict. Given these facts, Gear has not demonstrated that the trial court abused its discretion in denying his motion for a new trial.[2] For this reason, his third assignment of error is overruled.

---

[2] We will return to the subject of Gear's motion for a new trial in his fourth assignment of error where he asserts his trial counsel was ineffective for failing to timely file this motion. Specifically, in examining the prejudice element of the ineffective assistance of counsel claim, we will examine whether the motion for a new trial would have been successful if it had been timely filed.

-21-

*Fourth Assignment of Error*

**{¶47}** Gear argues that his trial counsel was ineffective for failing to call an expert witness and for failing to file a motion for a new trial.

Legal Standard

**{¶48}** "Under Ohio law, 'a properly licensed attorney is presumed to carry out his duties in a competent manner.'" *State v. Harvey*, 3d Dist. Marion No. 9-19-34, 2020-Ohio-329, ¶ 57, quoting *State v. Gee*, 3d Dist. Putnam No. 12-92-9, 1993 WL 270995 (July 22, 1993). "For this reason, the appellant has the burden of proving that he or she was denied the right to the effective assistance of counsel." *State v. Cartlidge*, 3d Dist. Seneca No. 13-19-44, 2020-Ohio-3615, ¶ 39. "In order to prove an ineffective assistance of counsel claim, the appellant must carry the burden of establishing (1) that his or her counsel's performance was deficient and (2) that this deficient performance prejudiced the defendant." *State v. McWay*, 3d Dist. Allen No. 1-17-42, 2018-Ohio-3618, ¶ 24, quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶49}** In order to establish deficient performance, the appellant must demonstrate that trial "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Howton*, *supra*, at ¶ 35, quoting *Strickland* at 687, 104 S.Ct. 2052. "[D]ebatable trial tactics do not establish ineffective assistance of counsel." *State v. Queen*, 3d

Dist. Logan No. 8-19-41, 2020-Ohio-618, ¶ 14, quoting *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101.

**{¶50}** "In order to establish prejudice, 'the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.'" *State v. Berry*, 3d Dist. Union No. 14-20-05, 2021-Ohio-1132, ¶ 122, quoting *State v. Bibbs*, 2016-Ohio-8396, 78 N.E.3d 343, ¶ 13 (3d Dist.). If the appellant does not establish one of these two prongs, the appellate court does not need to consider the facts of the case under the other prong of the test. *State v. Baker*, 3d Dist. Allen No. 1-17-61, 2018-Ohio-3431, ¶ 19, citing *State v. Walker*, 2016-Ohio-3499, 66 N.E.3d 349, ¶ 20 (3d Dist.).

### Legal Analysis

**{¶51}** Gear first argues that his trial counsel was ineffective for failing to call an expert witness to refute the State's claims relating to the blood found during the search. However, "[a] decision by trial counsel not to call an expert witness generally will not sustain a claim of ineffective assistance of counsel." *Wilson*, supra, at ¶ 134, quoting *Conway*, *supra*, at ¶ 118. "In fact, in many criminal cases trial counsel's decision not to seek expert testimony 'is unquestionably tactical because such an expert might uncover evidence that further inculpates the defendant.'" *State v. Costell*, 3d Dist. Union No. 14-21-02, 2021-Ohio-4363, ¶ 32, quoting *State v. Glover*, 12th Dist. Clermont App. No. CA2001-12-102, 2002-Ohio-6392, ¶ 95.

**{¶52}** On appeal, Gear simply asserts that his trial counsel was deficient for failing to call an expert witness. He has not advanced an argument that would suggest that any expert witness testimony would have been favorable to the Defense or would have changed the outcome of this case. A review of the trial transcripts reveals that defense counsel ably cross-examined the State's expert witnesses. Tr. 287-302, 336-337. As noted previously, the determination to call an expert witness is a tactical decision that falls squarely within the realm of trial strategy. *Costell* at ¶ 32. Given these facts, Gear has failed to establish an ineffective assistance of counsel claim with this argument.

**{¶53}** Next, Gear argues that his trial counsel was ineffective for failing to timely file his motion for a new trial. However, even if this act constituted deficient performance, Gear must still demonstrate that he was prejudiced in order to establish an ineffective assistance of counsel claim. In his third assignment of error, we concluded that the trial court did not abuse its discretion in denying a motion for a new trial that was not timely filed. We turn now to examining the contents of Gear's motion for a new trial to determine whether the outcome of this proceeding would have been different had this motion been timely filed.

**{¶54}** The basis of this motion for a new trial was a conversation that defense counsel had with a juror after the trial had concluded. Doc. 73. In his motion, Gear alleges that this juror suggested that "the jury did not actually believe that the Defendant tampered with any evidence" and that "the jury concluded that the

Defendant made a statement that mislead [sic] the investigators (a statement regarding his whereabouts on a particular date and time)." Doc. 73. Initially, we note that, at trial, the State did present the evidence that had led the police to believe that Gear had given them inaccurate information about his activities on June 25, 2016 as they were investigating Kori's disappearance. Tr. 166-167. *See* Tr. 214.

**{¶55}** Further, Gear also did not provide any information to explain the context of these comments in his motion for a new trial. Undoubtedly, at some point during many jury deliberations, not all jurors are convinced of the defendant's guilt. A lack of unanimity at some point during jury deliberations is not, in and of itself, sufficient to cast doubt on a verdict and does not provide grounds for a new trial. The evidence in the record does not suggest that the jurors remained unconvinced of Gear's guilt after the conclusion of the jury deliberations.

**{¶56}** In this case, all twelve jurors signed a verdict form that found Gear guilty of the charge against him. Doc. 70. Further, the jurors were also polled at the request of the Defense after the verdict had been delivered. Tr. 408. All twelve of the jurors affirmed the verdict of guilty on the charge of tampering with evidence in open court. Tr. 409-410.

> **[T]he jury poll is well suited to serve as the benchmark of finality. The poll is a solemn ceremony whose formality signals the conclusive nature of the verdict to all who are present. *Ross v. State*, * * * 24 Md.App. [246] at 255, 330 A.2d 507 [(1975), *reversed on other grounds, Ross v. State*, 276 Md. 664, 350 A.2d 680 (1976)]. The poll focuses each juror's attention on the verdict and gives each a clear-cut opportunity 'to declare in open court her assent**

> **to or dissent from the [verdict].'** *State v. Hessler* **(2000), 90 Ohio St.3d 108, 121, 734 N.E.2d 1237.**
>
> **The function of the poll is 'to enable the court and the parties to ascertain with certainty that a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented.'** *Miranda v. United States* **(C.A.1, 1958), 255 F.2d 9, 17 * * *.**

(Citations omitted.) *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 36-37. Thus, even if some jurors were not convinced of Gear's guilt at some point in the deliberations, the evidence available in the record strongly suggests that, in the course of deliberations, the jurors ultimately settled on the conclusion that Gear was guilty as charged. Doc. 70.

{¶57} The contents of the record have given us no reason to believe that Gear's motion for a new trial did not contain the most convincing representation of the juror's rather ambiguous statements. The contents of the record have also given us no reason to believe that his motion for a new trial omitted compelling contextual information that would have supported his position. The vague statements of this juror, as related through Gear's motion for a new trial, are not irreconcilable with the jury ultimately reaching the unanimous conclusion that Gear was guilty of the crime of tampering with evidence.

{¶58} In his motion for a new trial and in his arguments on appeal, Gear does not provide compelling reasons to call into question the verdict form signed by all twelve jurors or the results of the jury poll in which every juror declared assent to

their verdict of guilty in open court.  Based on the contents of the record, we cannot conclude that the ambiguous statements of this juror are sufficient to call the verdict in this case into question or that these ambiguous statements provide grounds for a new trial.  Thus, Gear has not demonstrated that, under the facts of this case, his motion for a new trial would have been successful if it had been timely filed and has not, therefore, demonstrated that he was prejudiced by the untimely filing of his motion for a new trial.  For this reason, we conclude that he has failed to carry the burden of establishing an ineffective assistance of counsel claim with this argument.

**{¶59}** Finally, Gear asserts that the cumulative errors of his trial counsel denied him his right to the effective assistance of counsel.  However,

> **[e]ach assertion of ineffective assistance of counsel going to cumulative error depends on the merits of each individual claim; when none of the individual claims of ineffective assistance of counsel have merit, cumulative error cannot be established simply by joining those meritless claims together.**

*State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 170.  We have already concluded that Gear has not demonstrated that his trial counsel committed multiple errors.  Thus, in the absence of establishing multiple errors were committed by his counsel at trial, he cannot establish cumulative error.  In conclusion, Gear has not, with these arguments, carried the burden of establishing an ineffective assistance of counsel claim on appeal.  Accordingly, his fourth assignment of error is overruled.

*Conclusion*

**{¶60}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Van Wert County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**MILLER, P.J. and ZIMMERMAN, J., concur.**

**/hls**